**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**SHARON ANN JOHNSTON,**

**Plaintiff,**

**-vs-**                                    **Case No.  6:09-cv-1937-Orl-28KRS**

**COMMISSIONER OF SOCIAL**
**SECURITY,**

**Defendant.**
_____

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT:**

This cause came on for consideration without oral argument on the Complaint filed by Sharon Ann Johnston, seeking review of the final decision of the Commissioner of Social Security denying her claim for social security benefits.  Doc. No. 1.  The Commissioner answered the Complaint and filed a certified copy of the record before the Social Security Administration (SSA).  Doc. No. 10.

## I.    PROCEDURAL  HISTORY.

In February 2007, Johnston applied for disability benefits under the Federal Old Age, Survivors and Disability Insurance Programs (OASDI), 42 U.S.C. § 401 *et seq.* (sometimes referred to herein as the Act).   R. 117-19.  She alleged that she became disabled on December 2, 2004.  R. 117.  Johnston's application was denied initially and on reconsideration.  R. 87-92.

Johnston requested a hearing before an administrative law judge (ALJ).  R. 96.
An ALJ held a hearing on April 15, 2009.  Johnston, represented by an attorney, testified
at the hearing.  Preston Johnston, Jr., Johnston's husband, and Donna Mancini, a
vocational expert (VE), also testified.  R. 43-82.

After considering the testimony and the medical evidence presented, the ALJ
determined that Johnston was insured under OASDI through December 31, 2010.  R. 24.
The ALJ found that Johnston had not engaged in substantial gainful activity since the
alleged onset date of her disability. R. 25.

The ALJ concluded that the medical evidence showed that Johnston had a history
of cardiac arrhythmia and arthritis, which were severe impairments.  R. 25.  These
impairments did not meet or equal any of the impairments listed in the applicable social
security regulations (the Listings).[1]  R. 29.

The ALJ also considered fibromyalgia as a possible impairment, but he found that
the existence of this condition was "not established by the requisite medical objective
evidence or longitudinal treatment history," citing Social Security Ruling 99-2p.  R. 26-27.
The ALJ also concluded that any mental impairment Johnston might have was not
severe.  R. 27.

The ALJ found that Johnston had the residual functional capacity (RFC) to perform
light work with occasional climbing, balancing, stooping, kneeling, crouching and crawling

---

[1]  The Code of Federal Regulations "contains a Listing of Impairments specifying
almost every sort of medical problem ('impairment') from which a person can suffer,
sorted into general categories."  *Shinn ex rel. Shinn v. Comm'r of Soc. Sec.*, 391 F.3d
1276, 1278 (11th Cir. 2004); 20 C.F.R. Part 404, Subpt. P, App. 1.

and that she must avoid work involving exposure to heights and more than occasional exposure to hazards, cold or pulmonary irritants.  R. 30.   In reaching this conclusion, the ALJ gave little weight to the opinion of Dr. Kapil, one of Johnston's treating physicians. R. 38.  The ALJ also found Johnston's testimony about the limitations arising from her impairments was not totally credible. R. 40.

Based on the RFC, and after considering the VE's testimony about Johnston's ability to perform certain jobs, the ALJ concluded that Johnston could return to her past relevant work as an administrative secretary and administrative assistant.  R. 41. Therefore, the ALJ concluded that Johnston was not disabled.  R. 42.

Johnston requested review of the ALJ's decision supported by additional medical statements. R. 4-7.  After considering the new evidence, the Appeals Council issued a decision on September 25, 2009 finding no basis to change the ALJ's decision.  R. 1-3. Johnston timely sought review of this decision by this Court.  Doc. No. 1.

## II.     JURISDICTION.

Plaintiff having exhausted her administrative remedies, the Court has jurisdiction to review the decision of the Commissioner pursuant to 42 U.S.C. § 405(g).

## III.    STANDARD OF REVIEW.

To be entitled to disability benefits under OASDI, a claimant must be unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 423(d)(1)(A).  A "physical or mental impairment" under the terms of the Act is one "that results from anatomical,

physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § 423(d)(3). In a case seeking disability benefits under OASDI, the claimant also must show that he or she became disabled before his or her insured status expired in order to be entitled to disability benefits.  42 U.S.C. § 423(c)(1); *Demandre v. Califano*, 591 F.2d 1088, 1090 (5th Cir. 1979) (per curiam).

Pursuant to 42 U.S.C. § 405(a), the SSA has promulgated a five-step inquiry that must be followed in determining whether a claimant is entitled to benefits.  In sum, an ALJ must apply the following criteria, in sequence:

> (1) Is the claimant presently unemployed?
>
> (2) Is the claimant's impairment severe?
>
> (3) Does the claimant's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1?
>
> (4) Is the claimant unable to perform his or her former occupation?
>
> (5) Is the claimant unable to perform any other work within the economy?

20 C.F.R. § 404.1520(a)(4).  An affirmative answer to any of the above questions leads to either the next question, or, on steps three and five, to a finding of disability.  A negative answer leads to a finding of "not disabled."  *See, e.g.*, *McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986).

"The burden is primarily on the claimant to prove that he is disabled, and therefore entitled to receive Social Security disability benefits."  *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001) (citing 20 C.F.R. § 404.1512(a)).  However, "the burden temporarily

shifts at step five to the Commissioner[,] . . . [who] must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform." *Id.* at 1278 n.2 (citing *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999)).

A court's review of a final decision by the SSA is limited to determining whether the ALJ's factual findings are supported by substantial evidence, *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005) (per curiam), and whether the ALJ applied the correct legal standards, *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988).

The SSA's findings of fact are conclusive if supported by substantial evidence.  42 U.S.C. § 405(g); *Dyer*, 395 F.3d at 1210.  "Substantial evidence is more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Walden v. Schweiker*, 672 F.2d 835, 838-39 (11th Cir. 1982)(internal quotations omitted).

The court "must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [SSA's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986) (per curiam) (citing *Tieniber v. Heckler*, 720 F.2d 1251, 1253 (11th Cir. 1983)).  Where the SSA's decision is supported by substantial evidence, the court will affirm, even if the court finds that the proof preponderates against the decision. *Dyer*, 395 F.3d at 1210.  The court may not reweigh the evidence or substitute its own judgment. *Id.*

While there is a presumption in favor of the SSA's findings of fact, no such presumption attaches to the ALJ's legal conclusion about the proper standards to be

applied in evaluating claims.  *Welch v. Bowen*, 854 F.2d 436, 438 (11th Cir. 1988) (per curiam).  Therefore, the court will reverse if the SSA incorrectly applied the law, or if the decision fails to provide the court with sufficient reasoning to determine that the SSA properly applied the law.  *Keeton v. Dep't of Health & Human Serv's*, 21 F.3d 1064, 1066 (11th Cir. 1994) (citing *Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991)).

When reviewing a final decision issued by the SSA, the court is authorized to "enter . . . a judgment affirming, modifying, or reversing the decision . . . with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).

## IV.     STATEMENT OF FACTS.

The relevant facts are adequately stated in the ALJ's decision and the parties' memoranda.  Therefore, I will only summarize the record bearing on the issues Johnston raises in her memorandum in order to protect her privacy to the extent possible.

Johnston was born in 1962.  R. 46.  She has associates degrees in Office Administration, Business Management and Marketing Operations.  R. 47, 159, 162-66.  She worked for almost twenty-one years as an administrative assistant/secretary at the same company.  R. 49-51.  This job required Johnston to sit about six hours a day, and frequently lift ten pounds or less.  R. 73-74, 152-53.  The VE testified that this was skilled work requiring a sedentary level of exertion.  R. 74.

Johnston's employer accommodated her medical condition even though she was in and out of work often.  R. 54, 152.  She estimated that she was absent or had to leave work early two or three days a month.  R. 63-64.[2]  Her job ended in October 2004 due to

---

[2]  The former human resources manager for Johnston's employer wrote that because of her longevity and past performance with the company, the company worked around her absences.  However, he indicated that "there would be a point where Sharon would have been unable to maintain the position in

the company restructuring. R. 47, 51, 54-55. She tried to return to work as an office manager at another company in May 2005. She worked only two and one-half weeks before she determined that she could not handle the stress of the job and left that position. R. 48.

Medical records reflect that Bhupendra Patel, M.D., treated Johnston at least since 1997. On July 16, 1997, Johnston complained of heart palpitations. An electrocardiogram revealed supraventricular tachycardia (SVT). Dr. Patel sent her to a hospital emergency room for treatment. R. 285.

Johnston returned to Dr. Patel in May 1998 again complaining of palpitations. R. 283. An electrocardiogram revealed complex arrhythmia, which was treated by ablation. R. 206-07. The diagnosis was SVT. R. 207. Johnston told Aurelio Duran, M.D., a cardiologist, that she was doing "phenomenally well" after that treatment. R. 207.

Johnston's condition deteriorated in 2002. She complained to Dr. Patel of recurrent SVT in March 2002. R. 268. She sought emergency room treatment for arrhythmia accompanied by shortness of breath and chest tightness and pressure. Dr. Patel referred her to Dr. Duran. R. 208. Testing showed a wide complex arrhythmia that Dr. Duran felt was suggestive of Bellhausen's tachycardia, which he treated with channel blocker therapy. R. 210. Johnston reported that Cardizem CD helped relieve her symptoms. However, a day after she had been extremely stressed or extremely physically active, she would have sensations that suggested to her that the arrhythmia would return. R. 210.

---

the capacity for which she was employed." R. 200.

On February 21, 2003, Johnston reported that she was doing very well on medication.  She sometime had the sensation that she was about to have tachycardia, but she had not had any episodes of arrhythmia.  R. 212.  A 24-hour holter monitor test showed no evidence of tachycardia or arrhythmia.  R. 213, 223-25.

In October 2003, Johnston told Dr. Duran that she was experiencing episodes of heart racing, fatigue and chest discomfort, which coincided with extreme stress over the possible loss of her job.  R. 218.

In 2005, a cardiac stress test revealed an anterior defect in the heart.  R. 214, 220. She had a cardiac catheterization to treat this defect.  R. 214-15, 227-28.

On March 6, 2007, Johnston told Dr. Patel that she had been doing "relatively well."  R. 244.  She reported no chest pain, palpitations, dizziness, or swelling in March, July and September of 2007.  R. 244, 322, 325.

On March 29, 2007, Jane McDuffie prepared a physical RFC assessment after review of Johnston's records.  McDuffie opined that Johnston could lift twenty pounds occasionally and ten pounds frequently, and that she could sit, stand or walk about six hours a day.  She should never climb ladders, ropes and scaffolds.  She should avoid concentrated exposure to fumes and hazards.  R. 286-93.  Nicolas Bancks, M.D., prepared a physical RFC report in June 2007.  He generally reached the same conclusions as McDuffie, except that he indicated that Johnston should only occasionally climb ladders, ropes and scaffolds and only occasionally balance, and he did not include a limitation on exposure to fumes.  R. 298-305.

On February 29, 2008, Johnston told Dr. Patel that she was having increasing episodes of SVT, for which her medication had been increased.  She did not have

shortness of breath, excessive sweating (diaphoresis), nausea, vomiting, palpitations, dizziness or swelling.  R. 319.

On May 1, 2008, Dr. Patel wrote that Johnston missed a lot of work due to the need for intermediate care of her chronic medical conditions.  R. 315.

In August 2008, Johnston told Dr. Patel she was having edema in her legs, with no other symptoms.  Dr. Patel indicated that it might be due to Cardizem.  R. 311.  As of September 2008, Johnston reported no chest pain, palpitations, dizziness or swelling.  R. 310.

On September 30, 2008, Johnston told Dr. Duran that she had not had any episodes but she felt she would get arrhythmia if she did not take it easy.  She also indicated that she had recently developed arthralgias.  R. 328.[3]

On October 9, 2008, Sanjiv Kapil, M.D., a rheumatologist, examined Johnston. Johnston complained of experiencing multiple joint pains over the previous two years. Her pain at the time of examination was primarily in the fingers of her left hand, with some mild discomfort in her right hand.  She had difficulty opening jars and bottles.  She also complained of pain in both shoulders and right hip (trochanteric region) pain.  Her ankles were stiff in the morning.  She also reported having low back pain for one month. She  was sleeping poorly and felt fatigued all day, with some headaches, anxiety and occasional depression.  R. 334.   She denied chest pain, and she only had shortness of breath on exertion.  R. 335.  Upon examination, Dr. Kapil noted tenderness in the joints of the hand, elbows, hips (trochanteric region), knees and paralumbar area.  She had fair

---

[3] In July 2009, Dr. Duran wrote that Johnston was followed by Dr. Patel after he treated her in September 2008.  R. 13.

grip strength and no loss of sensation or power in the lower extremities.  R. 336.

X-rays were essentially normal, showing only some mild degenerative changes in the lumbar spine and right knee.  R. 341-49.  Blood tests were also within normal ranges. R. 338-40.  Dr. Kapil's assessment was arthritis of the hands, knees and ankles, tendinitis of the elbows, trochanteric bursitis, neck and low back pain and possible fibromyalgia.  R. 336. She was treated with a muscle relaxant (Flexeril), Predinisone and Tylenol Arthritis.  R. 333.

On November 24, 2008, Dr. Kapil opined that Johnston had fibromyalgia.  He continued to treat Johnston with medication.  R. 330-31.

On March 2, 2009, Dr. Patel noted upon examination that Johnston had no tenderness and full active range of motion in her extremities.  R. 352.

On March 13, 2009, Dr. Kapil wrote that Johnston's fibromyalgia and arthritis limited her ability to function.  He noted that Johnston had "persistent inflammation of her hands, elbows, shoulders, neck, hips, knees, and ankles which limits her ability to perform fine and gross motor movements and any weight bearing activities."  R. 371. Pain, fatigue and anxiety also limited her ability to concentrate, persevere at a task or perform at an acceptable rate of speed in activities of daily living or in a work setting.  R. 371.

Dr. Patel wrote on August 19, 2009, that Johnson had severe medical problems as outlined by her cardiologist and rheumatologist that limited her abilities.  Based on these limitations, Dr. Patel opined that Johnston was disabled.  R. 5.

At the ALJ hearing, Johnston testified that she continued to have episodes when her heart would beat fast and her chest became tight.  She did not know what triggered

these events, although she believed they were brought on by stress and fatigue.  R. 53, 66, 152.  During an episode, she would get light headed, her chest hurt and she was short of breath.  R. 54, 152.  Johnston's husband testified that during an episode, Johnston would stare off into space.  R. 68.  These episodes occurred sporadically, sometimes as often at two or three times a week but sometimes there were no episodes in a two-week span.  R. 68, 152.   After experiencing such an episode, Johnston would not do anything for a couple of days to avoid another episode.  R. 54, 65, 152, 177.  She was taking Cardizem, Plaquenil, and Lovastin and a diuretic for her heart condition.  R. 55-57.  Cardizem caused her to gain weight and made her tired.  R. 172.

With respect to arthritis and fibromyalgia, Johnston testified that her hands hurt all the time and she sometimes lost feeling.  R. 61.  Her neck was stiff, and she had problems with her shoulders worse on the left than the right.  She received cortisone shots to help relieve pain in her hips.  She also had knee and ankle pain.  She had difficulty opening bottles and poor grip strength.  R. 62-63.  Her legs had also started swelling about a year before the hearing.  R. 66.  She also took an allergy pill, Darvocet as needed for pain, and Xanax.  R. 57.

Johnston estimated that she could sit or stand for ten to fifteen minutes before needing to change positions due to pain in her hips, legs and feet and swelling in her ankles and feet.  R. 57.  She walked around in her house for exercise. R. 58.

Her husband did housework at least ten to fifteen times a month, and he did the yardwork.  R. 58-59, 68.  Johnston picked up dirty clothes and did the laundry, but her husband carried the laundry to and from the washing machine.  R. 58-59, 68.  Johnston's husband testified that Johnston also cooked and took care of their minor son.  R. 71.  She

sometimes went grocery shopping.  R. 70.  Johnston took her son to school.  R. 59.  She also watched her son play travel-league baseball on the weekends.  R. 60, 70.  She was able to care for her personal hygiene.  R. 63.

The ALJ asked the VE to assume a hypothetical individual of the same age and education as Johnston who could lift twenty pounds occasionally, and ten pounds frequently, and sit or stand up to six hours in an eight-hour workday.  R. 74.  The individual could only occasionally climb, balance, stoop, kneel, crouch and crawl, and could not work at heights.  The individual could have only occasional exposure to hazards, cold and pulmonary irritants.  The VE opined that this individual could perform Johnson's past relevant work as an administrative secretary and administrative assistant.  Both of these jobs would provide for a sit/stand option giving the individual flexibility to move around when needed.  R. 75-76, 81.  If the individual had to miss work four or more days a month, the person would likely not be able to retain the job.  R. 77.

## V.   ANALYSIS.

Johnston asserts several assignments of error: (1) that the ALJ did not give adequate weight to the opinion of Dr. Kapil, a treating physician; (2) that the RFC and the finding that Johnston could return to her past relevant work is not supported by substantial evidence because the ALJ did not take into account limitations on Johnston's ability to maintain a work schedule; (3) that the ALJ failed to consider the side effects of medication; and, (4) that the Appeal Council erred by failing adequately to consider the new evidence presented to it.  These are the only issues I will address.[4]

---

[4] The parties were advised that issues not specifically raised would be waived. Doc. No. 11 at 2.

A.      *Weight Given to Opinion of Dr. Kapil.*

Dr. Kapil, a rheumatologist, treated Johnston in October and November 2009.  He

concluded that Johnston suffered from arthritis and fibromyalgia.  Medication returned

Johnston's ability to function on a limited basis.  Dr. Kapil opined, however, that Johnston

would still be limited as follows:

> Sharon has persistent inflammation of her hands, elbows,
> shoulders, neck , hips, knees, and ankles which limits her
> ability to perform fine and gross motor movements and any
> weight bearing activities.
>
> Sharon has limitations of daily living, such as doing household
> chores, grooming, driving, paying bills and attending functions
> with her twelve year old son.  Persistent symptoms, such as
> pain, severe fatigue, anxiety, and difficulty concentrating
> resulting from arthritis and fibromyalgia has limited her ability
> to do a task, to concentrate, to persevere at a task, or to
> perform the task at an acceptable rate of speed that applies
> not only to daily living but is also present in a work setting.

R. 371.   Johnston contends that the ALJ erred by giving little weight to Dr. Kapil's opinion

regarding her functional limitations.

The law regarding the weight to be given to opinions of treating physicians is well

developed.  Substantial weight must be given to the opinion, diagnosis and medical

evidence of a treating physician unless there is good cause to do otherwise. *See Lewis v.*

*Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997); *Edwards v. Sullivan*, 937 F.2d 580, 583

(11th Cir. 1991); 20 C.F.R. § 404.1527(d).  If a treating physician's opinion on the nature

and severity of a claimant's impairments is well-supported by medically acceptable clinical

and laboratory diagnostic techniques, and is not inconsistent with the other substantial

evidence in the record, the ALJ must give it controlling weight. 20 C.F.R. §

404.1527(d)(2). The ALJ may discount a treating physician's opinion or report regarding

an inability to work if it is unsupported by objective medical evidence or is wholly conclusory. *See Edwards*, 937 F.2d 580 (ALJ properly discounted treating physician's report where the physician was unsure of the accuracy of his findings and statements).

When a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments. *See Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986); *see also Schnor v. Bowen*, 816 F.2d 578, 582 (11th Cir. 1987). When a treating physician's opinion does not warrant controlling weight, the ALJ must nevertheless weigh the medical opinion based on the 1) length of the treatment relationship and the frequency of examination; 2) the nature and extent of the treatment relationship; 3) the medical evidence supporting the opinion; 4) consistency with the record as a whole; 5) specialization in the medical issues at issue; 6) other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(d).

At step two of the sequential evaluation, the ALJ rejected Dr. Kapil's assessment that Johnston suffered from fibromyalgia because "the existence of such condition is not established by the requisite medical objective evidence for longitudinal treatment history." R. 26.   He relied on Social Security Ruling 99-2p to support his summary of the medical signs that must be documented to establish the existence of fibromyalgia.  Social Security Ruling 99-2p, however, addresses cases involving chronic fatigue syndrome, not fibromyalgia.  *See* SSR 99-2p, 1999 WL 271569 (April 30, 1999).  The Ruling notes that there is "considerable overlap of symptoms" between chronic fatigue syndrome and fibromyalgia, but it does not address the specific criteria to establish fibromyalgia.  *Id.* at *8 n.3

At step two of the five-step evaluation process, the ALJ is called upon to determine whether a claimant's impairments are severe. By definition, this inquiry is a "threshold" inquiry. It allows only claims based on the most trivial impairments to be rejected. In this circuit, an impairment is not severe only if the abnormality is so slight and its effect so minimal that it would clearly not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience. A claimant need show only that his impairment is not so slight and its effect not so minimal. *McDaniel v. Bowen*, 800 F.2d 1026, 1031 (11th Cir. 1986). However, failure to find an impairment severe at step two can be harmless error if the ALJ considers the functional limitations of the impairment at later steps of the evaluation. *See, e.g., Maziarz v. Sec'y of Health and Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987).

In the present case, the ALJ did consider the functional limitations arising from fibromyalgia and arthritis at later steps of the evaluation.  He reviewed the complaints Johnston made to Dr. Kapil about her pain and stiffness on October 9, 2008.  R. 36-37.  He correctly noted that  x-rays and physical examination by Dr. Kapil did not provide objective evidence to support her complaints.  Specifically, the ALJ observed that in October 2008, Dr. Kapil observed some musculoskeletal tenderness but not sensory loss, good lower extremity power, and fair grip.  X-rays were normal except for minimal degenerative changes in the lumbar spine and right knee.  He also noted that, on October 29, 2008, Dr. Kapil observed a mild decrease in spine range of motion but no swelling in the extremities or significantly decreased grip strength.  R. 37.  On November 24, 2008, Johnston reported some pain relief with medication.  Dr. Kapil did not observe swelling.  R. 38.  As of March 3, 2009, Dr. Patel noted upon examination that Johnston had no

tenderness and full active range of motion in her extremities.  R. 38.

The ALJ also compared Johnston's complaints of limitations arising from pain and stiffness to her reported activities of daily living. Contrary to Dr. Kapil's expressed opinion, Johnston testified that she was able to drive her son to school and attend events with him, including his travel-league baseball games on the weekends.  She was also able to do household chores, including cooking and laundry, within her physical limitations.  R. 32.

All of these facts, which are supported by substantial evidence in the record, support the ALJ's conclusion that Johnston's arthritis and fibromyalgia were not as limiting as she represented them to be.  As in *Peters v. Astrue*, 232 F. App'x 866, 872 (11th Cir. 2007), and *Moore v. Barnhart*, 405 F.3d 1208, 1212 (11th Cir. 2005), the ALJ gave "specific cogent, and credible reasons for discounting the conclusions" of Dr. Kapil.  This is sufficient to establish good cause for giving little weight to Dr. Kapil's opinion regarding Johnston's functional limitations.

   *B.  Limitations on Ability to Maintain a Work Schedule.*

Johnston also asserts that the ALJ erred in evaluating her RFC and the ability to return to her past relevant work because he did not consider the limitations on her ability to maintain a work schedule. She relies on the letter from the human resources manager where she worked, her husband's testimony and opinions of both Dr. Patel and Dr. Kapil about limitations in this respect.

The human resources manager wrote that before the disability onset date, Johnston missed work recuperating from medical procedures used to address her heart conditions and other days when she was not feeling well enough to work.  He further opined that if this situation persisted, Johnston would not have been able to maintain her

job.  Because Johnston lost her job due to company restructuring in October 2004, the

human resources manager could offer no opinion about whether Johnston would continue

to miss many days of work after the alleged disability onset date.

Johnston's husband testified that Johnston might have episodes when she feared

tachycardia was imminent three or four times per month.  However, as the ALJ observed,

the medical records and Johnston's testimony show that she had few instances of actual

tachycardia after the alleged disability onset date.  *See* R. 40.  While Johnston told Dr.

Patel in February 2008 that she was having increased instances of SVT, R. 319, the

medical records do not document these events.   Rather, before and after that date she

consistently reported having no chest pain or palpitations.  *See* R. 244, 310, 322, 325,

328.  It is, therefore, apparent that what Johnston was reporting were "episodes where

she feels that she would get arrhythmias if she does not take it easy," not actual

tachycardia.  R.  328.

As for the opinion of Dr. Kapil, there is no basis in his limited treatment records to

support a finding that Johnston would not be able to function adequately in a work setting.

Dr. Patel opined only that Johnston missed work to seek medical care.  The medical

records reflect, however, that Johnston's doctors' visits and other medical procedures

occurred only occasionally, with no episodes of hospitalization after the cardiac

catheterization in 2005.

Finally, and most importantly, the ALJ did consider Johnston's complaints of lack

of ability to perform in a work setting.  He noted that Johnston was able to care for her

son, attend his baseball games, drive him to school, and do some household chores.  R.

28.  She reported to physicians that she was not fatigued.  R. 35.  Medication helped

relieve her joint pain.  R. 37.

For all of these records, in light of the evidence as a whole, Johnston has not sustained her burden of proving that she would have functional limitations on the ability to maintain a work schedule that should have been included in the RFC finding and the evaluation of whether she could return to her past relevant work.

C.     Side Effects of Medication.

The ALJ has a duty to elicit testimony and make findings regarding the effect of prescribed medications upon the ability to work, *Cowart v. Schweiker*, 662 F.2d 731, 735 (11th Cir. 1981), and the Commissioner's regulations require that in making a determination of disability the ALJ must consider the type, dosage, effectiveness and side effects of any medications. 20 C.F.R. § 404.1529(c)(3)(iv). Here, Johnston contends that the Commissioner failed to evaluate record evidence of side effects due to her medication.  Specifically, she contends that there is record evidence that she was allergic to Claritin, she reported tiredness, weight gain, and constipation as side effects of medication, and that doctor's notes also noted fatigue, dizziness and vertigo.  Doc. No. 14 at 14 (citing R. 172, 188, 251, 273-74, 276).

Initially, the Court notes that Johnston's recitation of the evidence in the record is not accurate.  The doctor's note cited as evidence that Johnston was allergic to Claritin states that Johnston "still has significant allergies and Claritin regular is not helping."  R. 276.  This does not support Johnston's contention that she was allergic to Claritin.

Similarly, Dr. Patel's records from September 2001 reflect that Johnston complained of dizziness, but there is no indication that the dizziness was a side effect of medication.  Rather, Dr. Patel indicated that Johnston might have a neurological deficit.

R. 273-74.  Dr. Patel's records in September 2006 reflect that Johnston complained of

fatigue and weight gain but there is no indication in the treatment notes that the

complaints were in anyway related to medication.  R. 251.

 Johnston wrote in disability reports that she was tired, had gained weight and was

constipated apparently due to Cardizem.  R. 172, 188.  Johnston did not cite any instance

in the record in which she complained of constipation to any treating physician, and there

is no indication how often this condition occurred or how it limited her ability to function.

Therefore, any error committed by the ALJ in failing to address this alleged side effect is

harmless.

 The ALJ specifically noted Johnston's complaints of fatigue and weight gain.  *See,*

*e.g.,*  R. 29 (obesity), 37-38 (fatigue).  He found that these subjective symptoms did not

preclude Johnston from performing work within the limits of his RFC determination.  R.

39-40.  He based this finding on Johnston's activities of daily living, which included taking

her son to school, attending his baseball games on weekends, and her ability to do

cooking and laundry within her physical limitations.  R. 32, 39. He also cited treatment

records in which Johnston reported that she was not fatigued.  R. 35.  These facts are

supported by record evidence.  Accordingly, the ALJ did not err by failing to address the

side effects of her medications.

 D. *New Evidence Submitted to the Appeals Council.*

 Johnston submitted statements from Dr. Patel and Dr. Duran to the Appeals

Council.  Johnston concedes that the Appeals Council reviewed this evidence.  Doc. No.

14 at 16. She argues, however, that the Appeals Council erred by failing to address in

detail why it found the newly submitted evidence insufficient to provide a basis for

changing the ALJ's decision.  Johnston cites no legal authority requiring the Appeals Council to explain in detail why it found newly submitted evidence insufficient to change an ALJ's decision.

When a plaintiff submits additional evidence to the Appeals Council and the Appeals Council denies review, the Court must determine whether the Commissioner's decision is supported by substantial evidence on the record as whole. *See Ingram v. Commissioner of Social Security*, 496 F.3d 1253, 1262, 1266 (11th Cir. 2007).  The statements of Dr. Patel and Dr. Duran submitted to the Appeals Council provide no new substantive information that was not considered by the ALJ.  Dr. Patel opined that Johnston has severe medical problems that limit her abilities, but she provided no examples of the limitations she believed existed.  R. 5.  Dr. Duran merely summarized his diagnoses and treatment of Johnston.  He did not render an opinion regarding any limitations on Johnston's functional capacity as a result of these conditions and treatment.

Because the Commissioner's decision is supported by substantial evidence on the record as a whole, for the reasons discussed herein, the Appeals Council did not err by failing to give a more detailed statement of why it did not find the newly submitted evidence sufficient to justify changing the ALJ's decision.

**VI.    RECOMMENDATION.**

For the reasons set forth herein, it is respectfully recommended that the decision of the Commissioner be **AFFIRMED**.  It is further recommended that the Court direct the Clerk of Court to issue a judgment consistent with its final order and, thereafter, to close the file.

Failure to file written objections to the proposed findings and recommendations

contained in this report within fourteen days from the date of its filing shall bar an

aggrieved party from attacking the factual findings on appeal.

**RESPECTFULLY RECOMMENDED** this 15th day of December, 2010.

*Karla R. Spaulding*

KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE

Copies to:
Presiding District Judge
Counsel of Record
Courtroom Deputy Clerk